## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ENID GRUBB,

       Plaintiff,

vs.                                         No. CIV 06-1260 JB/DJS

DIRK KEMPTHORNE, Secretary,
U.S. DEPARTMENT OF THE INTERIOR,
Bureau of Land Management,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment and Memorandum in Support, filed July 2, 2008 (Doc. 36)("Motion"). The Court held a hearing on August 15, 2008. The primary issue is whether the parties' broad release in a prior Title VII case covers a dispute about the Defendant's overpayment of salary to Plaintiff Enid Grubb. Because the Court concludes that the settlement agreement is not clear and is ambiguous, and because the parties' intent on the record before the Court is not clear, the Court will deny the Defendant's motion.

## FACTUAL BACKGROUND

Grubb was an employee of the Bureau of Land Management ("BLM") in the United States Department of the Interior for most of her twenty-two year federal career. See Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 1, filed July 16, 2008 (Doc. 37)("Response"). Grubb began work for BLM in 1979. See id. Beginning in 1989, Grubb worked as a petroleum engineering technician in the BLM's Farmington Field Office. See Motion at 1.

Over the years, Grubb filed numerous complaints against the BLM for various acts of alleged

sexual harassment, hostile work environment, and retaliation.  See id.  Grubb pursued many of these claims before the Equal Employment Opportunity Commission ("EEOC") and the Merit Systems Protection Board ("MSPB").  See id. at 1-2.  Other than an early administrative complaint that was settled by mutual agreement in 1997, Grubb was unsuccessful on every administrative complaint and appeal.  See id. at 2.

This litigation involves a debt that BLM's National Business Center has been attempting to collect from Grubb.  See id.  Grubb was erroneously billed for a net amount of $1,789.36.  See id. ¶ 1, at 2; Response ¶ 1, at 2.  The debt was for pay periods 199918 through 199922.  See Motion ¶ 1, at 2; Response ¶ 1, at 2. That bill was cancelled.  See Motion ¶ 1, at 2; Response ¶ 1, at 2; Exhibit A to Motion, Defendant's Amended Answers to Plaintiff's First Set of Interrogatories to Defendant Agency ("Defendant's Amended Answers"), Answer to Interrogatory No. 1, at 1 (verified June 19, 2008).

Grubb was also billed for a net amount of $7,265.77 for pay period 199923, pay periods 199925 through 200007, and pay periods 200010 through 200018.  See Defendant's Amended Answers to Interrogatory No. 1 at 1; Response ¶ 1, at 2. That bill was also cancelled.  See Defendant's Amended Answers to Interrogatory No. 1 at 1; Response ¶ 1, at 2.  While Grubb does not dispute these facts, she contends that she was underpaid for pay periods 200019 through 200025, and she contends that she had no way to verify the validity of the Defendant's repayment.  See Motion ¶ 3, at 2-3.

In February 1996, Grubb's employment position was downgraded from GS-11 to GS-7, and Grubb was entitled to retained pay for the downgrade, which the Defendant denied.  See Response at 1.  The repayment issue arose because of the downgrade in Grubb's pay status.  See id. In response to the Defendant's refusal to issue the retained pay, Grubb filed complaints with both the

EEOC and the MSPB.  See id.  The Defendant concedes the repayment issue was part of Grubb's Title VII claims.  See Defendant's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 6, filed August 4, 2008 (Doc. 41)("Reply").  Grubb maintains, however,  that her dispute with both the Defendant's payment and collection attempts has been part of her Title VII Complaint since 2001. See Response at 1-2.

The Defendant subsequently determined that Grubb was owed back pay.  See Reply at 6.  There is no dispute in this case that Grubb was underpaid for pay periods 200019 through 200025. See Motion ¶ 3, at 3; Response ¶ 3, at 2-3.  The Defendant contends, however, that, in pay period 200026, Grubb received payments for the pay periods that were part of the erroneous debts which were cancelled and that was compensated for the underpayment that occurred in pay periods 200019 through 200025.  See Defendant's Amended Answer to Interrogatory No. 1, at 1; Motion ¶¶ 3, 4, at 3.  The Defendant maintains that, because Grubb was originally paid correctly, and because there were no collections from her pay when the erroneous debts were generated, Grubb should not have received these payments.  See Defendant's Amended Answer to Interrogatory No. 1, at 2.  The Defendant has submitted a spreadsheet showing its calculation of the overpayment.  See Exhibit A to the Defendant's Amended Answers ("Spreadsheet").  The Defendant maintains that the amount of the overpayment was $6,730.03.  See Motion ¶ 4, at 3.

Grubb maintains, on the other hand, that, because of errors in adjustments made in compensation payment, she had no way to verify the validity of the Defendant's repayment, but does not supply evidence to support this assertion.  See Response ¶ 3, at 2-3.  Grubb states that, despite repeated requests, the Defendant refused to provide her with accounting records so that she could verify the validity of the Defendant's bills and credits.  See Response ¶ 4, at 3.  Grubb represents that she has disputed the alleged overpayments and collection attempts since the Defendant first

raised the issues.  See id.  Grubb does not, however, provide any evidence to support her allegations

that she disputed the overpayment, and instead provides a copy of her Fourth Motion to Amend

Complaint  Grubb v. Babbitt, EEOC Case No. 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X (dated February 20, 2001), in her

dispute in the EEOC Phoenix District Office, as support for her allegations that she disputed the

overpayment.  See Exhibit 2 to Response, Fourth Motion to Amend Complaint (dated February 20,

2001) at 1-3 ("Motion to Amend").  In any case, in January 1997, Grubb agreed to settle her initial

EEOC claim to retained pay, which resulted in the dismissal of her MSPB claim regarding retained

pay.  See Response at 1.

There is some confusion about when the overpayment and repayment occurred.  The

overpayment to Grubb took place within the same time frame as the repayment issue.  The

Defendant contends, however, that the overpayment occurred in 2000.  See Reply at 3.in

Grubb was terminated from federal employment for cause in January 2002.  See Motion at

1.  Before separation from the BLM, all employee debts are created and maintained by the United

States Department of the Interior National Business Center.  See Motion ¶ 5, at 3-4.  After Grubb

separated from the BLM, her debt was referred to the BLM National Business Center for collection.

See id.

At a January 29, 2002 hearing, before the EEOC, the Defendant's agent, Arthur Arguedas,

argued that Grubb's claims for repayment and the repayment issue were moot because the Defendant

had corrected its failure to pay, asserting that the repayment issue was a paperwork mistake.  See

Response at 1-2; Reply at 6.  The administrative law judge determined that the repayment issue

could constitute a Title VII claim.  See Reply at 6.  Grubb did not, however,  lodge a complaint with

the EEOC at any juncture that she had received compensation to which she was not entitled.  See

Motion at 11.

-4-

After her termination, Grubb proceeded with a Title VII action in the United States District Court for the District of New Mexico.  See Grubb v. Norton, No. CIV 02-1641 JH/ACT. Grubb assumed that the overpayment/debt issue was moot when she filed her judicial complaint, because she had not been notified of any further debts alleged by the Defendant.  See Response at 2.  In 2005, however, while Grubb's federal action was pending, the Defendant issued another bill seeking repayment of the alleged overpayment to Grubb.  See Response at 2; Exhibit B to Motion, Bill for Collection (dated March 8, 2005)("March 8, 2005 Bill").  That debt, which was reflected in Bill for Collection 2005021137, dated March 8, 2005, was the result of Grubb having received a payment correcting her pay, but in fact overpaid her.  See Defendant's Amended Answer to Interrogatory No. 4, at 3.  The Bill for Collection 2005021137 issued to Grubb gave her thirty days to pay or to dispute the bill.  See id.

The 2005 bill was for a different amount than the previous bills, but still allegedly stemmed from the time period covered by Grubb's Title VII complaint.  See Response at 2.  Grubb states that the Defendant did not provide any accounting records to support the validity of the amount claimed, but Grubb does not provide record support for this assertion.  See id.

The National Business Center did not receive a payment or a response to its Bill for Collection.  See Defendant's Amended Answer to Interrogatory No.  4 at 3; March 8, 2005 Bill.  Because of the lack of payment and/or a response, a demand letter was sent on April 11, 2005.  See Defendant's Amended Answer to Interrogatory No. 4 at 3; Exhibit C to Motion, Letter from the United States Department of the Interior to Enid Grubb (dated April 11, 2005 at 1 ("Demand Letter").  Grubb disputes these facts, and states that she repeatedly disputed the Defendant's attempts to collect the allegedly unsubstantiated debts and was never provided evidence to support the validity of the Defendant's claims.  See Response at 2.  Again, however, Grubb does not provide

-5-

evidence to support her position.  While Grubb disputes in this case the Defendant's allegations and specifically denies that the Defendant overpaid her, she does so in her brief and not by affidavit. What she stated in her 2001 affidavit in <u>Grubb v. Babbitt</u> is the following:

> The continuing actions by the Agency with regard to their Termination of Retained Pay fiasco that continues to this day . . . .  including all of the bills I have received to date . . .  and the volume of correspondence it has taken to attempt to straighten this matter out . . . . . Two weeks ago, I received a phone call from the Payroll Office that advised me that everything the Personnel Office had done to reverse the Termination of Retained Pay was done in "error[,"] and I would be receiving yet another bill, this time for approximately $12,000.  I immediately advised the Personnel Office, and they said that Payroll would be "auditing" my earnings, and that is where the matter stands at this time.

Exhibit 2 to Response, Enid Grubb's Affidavit in Support of Fourth Motion to File Amended Complaint ¶ 3f, at 2 (dated February 20, 2001)(unsigned)("Grubb Aff.").  <u>See</u> Affidavit of Enid Grubb ¶ 14, 17, at 2(taken July 15, 2008)("Second Grubb Aff.")(stating that the Defendant would not explain how the alleged overpayment bills were calculated and that the Defendant issued bills for alleged overpayment of retained pay).

There is no dispute that Grubb knew of this debt, and that the Defendant contended that she owed the BLM money, before the time that the settlement in the underlying action Title VII was reached.  Grubb disputed the debt in her letter of September 23, 2005 to Susan Cummings, of Linebarger Goggan Blaire & Sampson, LLP, which was copied to Grubb's counsel, Ms. Hanna Best. <u>See</u> Letter from Enid Grubb to Susan Cummings at 1 (dated September 23, 2005)("September 23, 2005 Letter").  Nonetheless, neither Grubb nor her counsel raised this issue during the settlement negotiations.  <u>See</u> Motion at 11.

Following current procedures for nonpayment, the debt was referred to the Department of the Treasury for collection on October 15, 2005.  <u>See</u> Defendant's Amended Answer to Interrogatory No. 4, at 4.  In her written response, Grubb denies these facts given that she does not

have sufficient knowledge of what internal procedures were required and/or taken with respect to any alleged debt, but does not deny them in her affidavits.  <u>See</u> Response  ¶ 8. at 3.  <u>See</u> Second Grubb Aff. ¶¶ 3, 10, 13, 14, 17, at 1, 2 (stating that Grubb was billed for alleged wage overpayments and that the Defendant did not respond to her demands that the Defendant explain the actual accounting calculations).  Grubb does not, however, offer competent evidence to create a conflict regarding the Defendant's initial collection procedures.

The Defendant contends that, on October 21, 2005, the National Business Center received the dispute from the Department of the Treasury.  <u>See</u> Motion ¶ 9, at 4; Defendants' Amended Answers to Interrogatory No. 4, at 4.  The Defendant also maintains that this contact was the first time that the National Business Center was notified that Grubb was disputing the debt.  <u>See</u> Motion ¶ 9, at 4; Defendants' Amended Answers to Interrogatory No. 4, at 4.  Grubb denies these facts, and states that she has disputed the validity of the Defendant's alleged overpayment and collection attempts since they began.  <u>See</u> Response ¶ 8, at 3.  Again, however, Grubb does not provide any sworn testimony to dispute the Defendant's statements.  <u>See</u> Grubb Aff. ¶ 3f, at 2; Second Grubb Aff. ¶¶ 3, 10, 13, 14, 17, at 1, 2 (stating that Grubb was billed for alleged wage overpayments and that the Defendant did not respond to her demands that the Defendant explain the actual accounting calculations).

On the eve of the Title VII trial in November, 2005, however, that litigation was settled.  <u>See</u> Stipulation for Compromise Settlement and Release of Claims Under Title VII of the Civil Rights Act of 1964 ("Settlement Agreement ")(dated November 9, 2005).  As part of the settlement in November, 2005, the parties entered into the Settlement Agreement that resolved "each and every claim of any kind whatsoever."  Settlement Agreement at 1.  The Settlement Agreement stated:

Stipulation for Compromise Settlement and Release of Claims Under Title VII of the

Civil Rights Act of 1964

It is hereby stipulated by and between Plaintiff Enid Grubb (Plaintiff) and Defendant Gale A. Norton, Secretary, U.S. Department of the Interior (Defendant), by and through their respective attorneys as follows:

1. The parties do hereby agree to settle and compromise each and every claim of any kind whatsoever, whether known or unknown and all claims of Plaintiff which could have been brought as of the date of the execution of this Stipulation for Compromise Settlement and Release of Claims Under Title VII of the Civil Rights Act of 1964 (Stipulation for Compromise Settlement) arising directly or indirectly from the acts or omissions beginning in 1989 at the Farmington Field Office, Bureau of Land Management, Department of the Interior, that gave rise to an action filed in the United States District Court for the District of New Mexico in which Enid Grubb is the Plaintiff and Gale A. Norton, Secretary, U.S. Department of the Interior, is the Defendant, bearing cause number Civil No. 02-1641 JH/ACT, and the actions brought by Plaintiff before the Merit Systems Protection Board in which Enid Grubb is the Plaintiff and the Department of the Interior is the Defendant, bearing cause numbers DE-1221-02-0041-W-2, DE-0752-02-0112-I-1, and DE-1221-01-0025-W-2, including, but not limited to, claims for damages allegedly received because of discrimination on the basis of sex (female), hostile work environment, and reprisal/retaliation for having engaged in protected activity and/or whistleblowing under the terms set forth in this Stipulation for Compromise Settlement.

2. Defendant Gale A. Norton, Secretary, U.S. Department of the Interior, agrees to pay to Plaintiff Enid Grubb the sum of Eighty Thousand Five Hundred Sixty Five and 31/100's Dollars ($80,565.31), which sum shall be in full settlement and satisfaction of any and all claims, demands, rights, and causes of action of whatsoever kind and nature arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Title VII), all claims of Plaintiff Enid Grubb which are the subject of the above-referenced actions, and all claims which could have been brought as of the date of the execution of this Stipulation for Compromise Settlement.

3. Defendant Gale A. Norton, Secretary, U.S. Department of the Interior, agrees to pay to Plaintiff's attorney, Hannah B. Best, Esq., the sum of Forty Four Thousand Four Hundred Thirty Four and 69/100's Dollars ($44,434.69), which sum shall be in full settlement and satisfaction of attorneys' fees and costs in this matter.

4.      Plaintiff Enid Grubb and her guardians, heirs, executors, administrators, and assigns hereby agree to accept the sums set forth in this Stipulation for Compromise Settlement in full settlement and satisfaction of any and all claims, demands, rights, and causes of action of whatsoever kind and nature against Defendant Gale A. Norton, Secretary, U.S. Department of the Interior, her agents, servants, and employees on account of the same subject matter that gave rise to the above-referenced actions, and all claims which could have been brought as of the date of the execution of this Stipulation for Compromise Settlement.

5.      Plaintiff's signature upon this Stipulation for Compromise Settlement shall constitute a permanent and unconditional release and waiver by Plaintiff, her heirs, executors, administrators, and assigns of any and all claims of discrimination on the basis of sex (female), hostile work environment, and/or reprisal/retaliation for having engaged in protected activity and/or whistleblowing arising from her employment at the Bureau of Land Management, Department of the Interior, as of the date of the execution of this Stipulation for Compromise Settlement.  This includes, but is not limited to, claims for front pay, back pay, compensatory damages, punitive damages, interest and/or attorneys' fees and costs, incurred by any attorney at any time during the processing of Plaintiff's complaints.

Settlement Agreement at ¶¶ 1-5, at 1-3.  The Settlement Agreement also states: "This settlement is entered into by all parties for the purpose of compromising disputed claims to avoid the expenses and risks of further litigation."  Id. ¶ 7, at 3.  There is no provision in the Settlement Agreement that refers specifically to the debt.  The release does not refer to or identify the overpayment claim.  The parties' communications just before entering into the Settlement Agreement include demands on Grubb's part that the Defendant did not incorporate into the Settlement Agreement.  See Letter from Hanna B. Best to Phyllis A. Dow, Assistant United States Attorney at 1 (dated October 24, 2005)(letter from Grubb's attorney requesting that the Defendant change Grubb's official personnel file records); Letter from Phyllis A. Dow to Hanna B. Best at 1 (dated November 8, 2005)(refusing Grubb's request that the Defendant change her official personnel file records).

Grubb entered into the Settlement Agreement in good faith believing that the Defendant's

claims for overpayment were encompassed within the four corners of the Settlement Agreement. Both Grubb and her counsel assert that their intent when entering into the Settlement Agreement was to satisfy any and all claims, by either party, stemming from Grubb's federal employment.  See Second Grubb Aff. ¶¶ 16-20, at 2-3 (supporting the assertion that the Settlement Agreement was to satisfy any and all claims, by either party); Affidavit of Hannah B. Best ¶¶ 1-4, at 1-2 (executed July 18, 2008)("Best Aff."). Grubb and her counsel make this representation in their sworn affidavits. See Second Grubb Aff.; Best Aff.

## PROCEDURAL BACKGROUND

The Defendant contacted Grubb's counsel about this motion, and Grubb opposes this motion. See Motion at 1.  The Defendant files this motion for summary judgment pursuant to rule 56 of the Federal Rules of Civil Procedure.  See id.  The Defendant requests the Court for an order granting his motion for summary judgment, a dismissal of the Plaintiff's Complaint for Breach of Settlement Contract with prejudice, and for costs incurred herein.  See id. at 12.

On July 16, 2008, Grubb filed her Response in Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support.  See Response.  On August 4, 2008, the Defendant filed a Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support.  See Reply.  On August 8, 2004, the Defendant filed a Notice of Completion of Briefing Package on Defendant's Motion for Summary Judgment and Memorandum in Support Thereof (Doc. No. 36), giving notice that the briefing package on the Defendant's motion for summary judgment is ready for decision.  See Doc. 42.

At the August 15, 2008 hearing, Defendant's counsel, Ms. Phyllis Dow, stated that she did not provide declarations from herself or Mr. Arguedas, the attorney who worked on the underlying administrative claim and assisted Ms. Dow with the underlying litigation, because she did not want

to make herself or Mr. Arguedas witnesses.  <u>See</u> Transcript of Hearing at 8:9-16 (taken August 15, 2008)("Tr.")(Dow).[1]  Ms. Dow indicated her testimony would be that the issue of the overpayment debt was never raised with her or Mr. Arguedas during the course of negotiations.  <u>See</u> <u>id.</u> at 9:5-9 (Dow); <u>id.</u> at 9:9 (Dow).  The Defendant maintained that Grubb knew of the outstanding debt during the settlement negotiations, but did not raise the debt during the negotiations.  <u>See</u> <u>id.</u> at 9:14-19 (Dow); <u>id.</u> at 9:21-22 (Dow).   Ms. Dow indicated that, had Grubb's attorney, Ms. Hanna Best, brought up the debt, she would have made certain that it was part of the negotiations.  <u>See</u> <u>id.</u> at 9:25-10:6 (Dow & Court).  Ms. Dow indicated that she doubted Ms. Best "really contemplated at the time we entered into the settlement negotiation that i[t] . . . was part of the settlement."  <u>Id.</u> at 10:10-12 (Dow).  The Defendant conceded that there is an issue whether the parties had a meeting of the minds.  <u>See</u> <u>id.</u> at 11:24-6 (Court & Dow).  The Defendant maintained that it did not want the Settlement Agreement declared void.  <u>See</u> <u>id.</u> at 12:15-18 (Dow). Ms. Dow indicated that, when the Settlement Agreement was reached, she did not have stated authority from her client to resolve the $7,000.00 debt.  <u>See</u> <u>id.</u> at 13:18-5 (Dow).  The Defendant contended that Grubb should be estopped from contending that the debt was included in the Settlement Agreement.  <u>See</u> <u>id.</u> at 20:14-16 (Dow).

Grubb contended that Mr. Arguedas had authority to settle the debt on behalf of the agency.  <u>See</u> <u>id.</u> at 14:24-15:2 (Best).  Grubb maintained that it was difficult to say whether the retained pay or the overpayment occurred first because the demotion, retained pay, and overpayment all occurred within the same time period.  <u>See</u> <u>id.</u> at 15:16-25 (Best & Court).  Ms. Best asked the Court to deny the motion and send the parties back to settlement negotiations.  <u>See</u> <u>id.</u> at 18:6-7 (Best); <u>id.</u> at

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

18:14-15 (Best).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT
## AND STANDARDS UNDER RULE 56

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)(quoting Fed. R. Civ. P. 1).  Summary judgment is a proper remedy when the movant demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Thrasher v. B&B Chem. Co., 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case.  See Celotex Corp. v. Catrett, 477 U.S. at 323; Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)("The moving party has the initial burden to show that there is an absence of evidence to support the nonmoving party's case.")(internal quotation marks omitted).  A motion for summary judgment need not contain evidence in a form admissible at trial.  See Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)("At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'")(quoting Celotex Corp. v. Catrett, 477 U.S. at 324).

Once the movant meets this burden, rule 56(e) requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256; Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which

it carries the burden of proof.")(internal quotation marks omitted); <u>Otteson v. United States</u>, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'")(quoting <u>Coleman v. Darden</u>, 595 F.2d 533, 536 (10th Cir. 1979)).  The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256.  <u>See</u> <u>Abercrombie v. City of Catoosa</u>, 896 F.2d 1228, 1231 (10th Cir. 1990)("[The p]laintiff merely has alleged two isolated statements, one by [one defendant] and one by [another defendant]. Without any evidence of communication between [those defendants], there is nothing to give rise to the inference that they conspired."); <u>Bruce v. Martin-Marietta Corp.</u>, 544 F.2d 442, 445 (10th Cir. 1976)("Conclusory allegations do not establish an issue of fact under Rule 56."). "The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." <u>Colony Nat'l Ins. Co. v. Omer</u>, No. 07-2123, 2008 WL 2309005 at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and <u>Argo v. Blue Cross and Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on

suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005 at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. The mere existence of a scintilla of evidence will not avoid summary judgment. See Vitkus v. Beatrice Co., 11 F.3d at 1539. There must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill and Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871); Vitkus v. Beatrice Co., 11 F.3d at 1539). "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"It is well established . . . that a party cannot rely on unauthenticated documents to avoid summary judgment." IBP, Inc. V. Mercantile Bank of Topeka, 6 F.Supp.2d 1258, 1263 (D. Kan. 1998). One district court within the Tenth Circuit has stated that the remedy is usually not to grant outright the motion for summary judgment, but it is at least to disregard the facts not supported by evidence. See Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454 at *1 n.3 (D. Colo. June 30, 2006))(ignoring plaintiff's "unsubstantiated proffered facts" in the court's summary judgment analysis).

-14-

**RELEVANT LAW REGARDING INTERPRETATION OF CONTRACTS**

Public policy supports the enforceability of settlement agreements, because our legal system "[f]avor[s] the amicable adjustment of disputes and the concomitant avoidance of costly and time consuming litigation." Jeff D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1989)(quoting In re Springpark Assoc., 623 F.2d 1377, 1380 (9th Cir. 1978)). The United States Court of Appeals for the Tenth Circuit has held that federal common law will govern a settlement in a Title VII employment case unless the parties agree that state law will govern the agreement. See Chavez v. New Mexico, 397 F.3d 826, 830-31 (10th Cir. 2005)(stating that, generally, "the enforcement and interpretation of settlement agreements in Title VII cases are governed by federal common law because such settlements are inextricably linked to the underlying law of Title VII.")(internal quotation marks omitted)(citing Heuser v. Kephart, 215 F.3d 1186, 1190 (10th Cir. 2000)). "Because the settlement agreement [in a Title VII action against the government] is a government contract, federal common law governs its interpretation." Francisco v. Principi, 32 Fed. Appx. 141, 145 (7th Cir. 2002)(citing Funeral Fin. Sys. v. United States, 234 F.3d 1015, 1018 (7th Cir. 2000)). See Chaly-Garcia v. United States, 508 F.3d 1201, 1203 (9th Cir. 2007)("Contracts with the United States are governed by federal law.").

Nevertheless, "[a]n agreement to settle a legal dispute is a contract and its enforceability is governed by familiar principles of contract law." Jeff D. v. Andrus, 899 F.2d at 759. The Tenth Circuit in Heuser v. Kephart noted that the "applicable principles of contract law are not different in federal and New Mexico law." Heuser v. Kephart, 215 F.3d at 1191. "[T]he primary goal of contract interpretation is to determine and give effect to the intention of the parties." Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1149 (10th Cir. 2000)(internal quotation marks and bracket omitted).

-15-

It is a well-established principle of contract law that, in a contract dispute requiring interpretation of the meaning of the contract, "the plain language of [a] contract should be considered first." Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999)(citing Textron Defense Sys. v. Widnall, 143 F.3d 1465, 1469 (Fed. Cir. 1998), and Leicht v. Bateman Eichler, Hill Richards, Inc., 848 F.2d 130, 133 (9th Cir. 1988)).   On the other hand, the court should look at the entirety of the document, and "reference must be made to all the provisions of the agreement." Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1149 (internal quotation marks omitted).   "A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999).  Further, "[u]nder federal common law, we must interpret the settlement agreement 'in an ordinary and popular sense as would a person of average intelligence and experience.'" Francisco v. Principi, 32 Fed. Appx. at 145 (quoting Funeral Fin. Sys. v. United States, 234 F.3d at 1018).

The United States Court of Appeals for the Ninth Circuit in Klamath Water Users Protective Association v. Patterson notes that "[t]he fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation."  204 F.3d at 1210.  "The interpretation of an ambiguous contract involves factual findings as to the parties' intent." United States v. Microsoft Corp., 147 F.3d 935, 963 (D.C.Cir. 1998).

> The question of whether an agreement contains an ambiguity is a matter of law to be decided by the trial court . . . . If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. . . . Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact.

Mark V, Inc. v. Mellekas, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993)(internal citations and

-16-

quotation marks omitted).

"Generally, in order to set aside or avoid a written release, there must be evidence of misrepresentation, fraud, undue influence, coercion or mutual mistake, and such evidence must be clear and convincing." Hendren v. Allstate Ins. Co., 100 N.M. 506, 508, 672 P.2d 1137, 1139 (Ct. App. 1983). "If defendant, at the time, was ignorant of the existence of other claims, there would have been a mutual mistake that should be rectified. If it was aware, and slyly kept silent, the result should be same." Hashway v. Ciba-Geigy Corp., 755 F.2d 209, 211 (1st Cir. 1985).

In Melton v. Department of Health and Human Services, 212 Fed.Appx. 988 (Fed. Cir. 2007), the United States Court of Appeals for the Federal Circuit held that a settlement agreement did not prevent the federal agency from recovering its erroneous overpayment, where "the settlement agreement [wa]s silent about Ms. Melton's AWOL debt." 212 Fed.Appx. at 990. The settlement agreement, in relevant part, stated:

> 1. The agency agrees to pay Ms. Melton the sum of $32,000.00 within 30 calendar days from the effective date of this agreement for promises set forth below . . . .
>
> * * * *
>
> 9. Ms. Melton fully understands her removal from federal service, as cited above, will remain in full force and effect.
>
> * * * *
>
> 14. This agreement constitutes the complete understanding between the parties. No other promises or agreements shall be binding unless signed by all parties and expressly designated as an amendment to this agreement.

Id. at 989. The plaintiff sought "enforcement of the settlement agreement, based on an alleged violation by the Agency. The alleged violation is the Government's effort to recover an erroneous overpayment of $8,056.76. The erroneous overpayment stems from a period, prior to her removal, when [the plaintiff] was paid while absent without leave (AWOL)." Id. at 989. The Federal Circuit

explained: "To the extent the contract is clearly stated and understood by the parties, it is enforced according to its terms." Id. at 990. "If the language of the contract is sufficiently clear, the inquiry ends there." Id. "If any ambiguity is found, our role is to implement the intent of the parties at the time the contract was made." Id. The Federal Circuit did not find any ambiguity because

> the settlement agreement is silent about Ms. Melton's AWOL debt. The most relevant sections are paragraphs 1 and 9, and these paragraphs specify a lump sum payment to Ms. Melton in exchange for her removal from the Agency. Paragraph 14 adds that "[n]o other promises or agreements shall be binding unless signed by all parties and expressly designated as an amendment to this agreement." Nothing in the settlement agreement addresses whether the Agency may or may not collect debts duly owed.

212 Fed.Appx. at 989.

In United States v. Robertson, 477 F.2d 882 (5th Cir. 1973), the United States Court of Appeals for the Fifth Circuit found that, despite a "very broad release on the part of the government," the settlement was specifically limited to the fund at issue in the prior litigation, and did not, as the plaintiff had argued, have any "bearing upon any claims unrelated" to the fund.  477 F.2d at 884.  The Fifth Circuit found: "The agreement is unambiguous on its face and, for that reason, additional testimony would not avail to alter its clear meaning."  Id.

"It is for the court to determine, as a matter of law, whether the contract is ambiguous." Sierra Blanca Sales Co., Inc. v. Newco Indus., Inc., 84 N.M. 524, 529, 505 P.2d 867, 872 (Ct. App. 1972).  If a court determines that a contract is ambiguous, then "[t]he intent of the parties [must] . . . be ascertained from the language and conduct of the parties and the surrounding circumstances." Id., 84 N.M. at 530, 505 P.2d at 873.  The New Mexico Court of Appeals explained in Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc.: "A mutual mistake [of fact] exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties."  84 N.M. at 530, 505 P.2d

-18-

at 873.  A mutual mistake of fact exists where the parties make the same mistake -- like assuming that a party to a contract was a corporation.  See id., 84 N.M. at 530, 505 P.2d at 873.  The question of mutual mistake is an issue for a jury to determine.  See id., 84 N.M. at 530, 505 P.2d at 873.  In Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc., the New Mexico Court of Appeals explained that a unilateral mistake is "a misrepresentation of a material fact which is justifiably relied on by the party seeking rescission."  84 N.M. at 873, 505 P.2d at 873.  See Cargill v. Sherrod, 96 N.M. 431, 433, 631 P.2d 726, 728 (1981)("For a mistake to be mutual and common to both parties, it must appear that both parties have done what neither intended.").

"Under the doctrine of mutual mistake, a written agreement may either be (1) reformed to express the intent of the parties, . . . or (2) avoided by the adversely-affected party unless that party bore the risk of mistake."  Twin Forks Ranch, Inc. v. Brooks, 120 N.M. 832, 835, 907 P.2d 1013, 1016 (Ct. App. 1995).  "Extrinsic evidence is admissible to establish that the [contract] did not express the true agreement of the parties, even if the inconsistency cannot be detected on the face of the [contract]  and becomes clear only in light of surrounding circumstances."  Id., 120 N.M. at 836, 907 P.2d at 1017.  If "the evidence is capable of equally reasonable but opposite inference[s]" then "summary judgment is improper."  Id., 120 N.M. at 835-36, 907 P.2d at 1016-17.

## RELEVANT LAW REGARDING
## MEETING OF THE MINDS ON MATERIAL TERMS

"[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."  Restatement (Second) of Contracts § 17 (1981).  The commentary to Restatement (Second) of Contracts § 17 states:

The element of agreement is sometimes referred to as a "meeting of the minds." The parties to most contracts give actual as well as apparent assent, but it is clear that a mental reservation of a party to a bargain does not impair the obligation he purports to undertake. The phrase used here, therefore, is "manifestation of mutual assent,"

-19-

as in the definition of "agreement."

Id. cmt. c.  If the parties do not enter into "an agreement regarding the essential and material aspects of the [contract] and [if] there [is] not . . . a meeting of the minds, there is no enforceable contract between [the parties]."  Balboa Const. Co., Inc. v. Golden, 97 N.M. 299, 302, 639 P.2d 586, 589 (Ct. App. 1981).  Material terms include areas such as subject matter, price, payment terms, quantity, quality, and duration, such "that the promises and performance to be rendered by each party are reasonably certain."  Tauber v. Quan, 938 A.2d 724, 730 (D.C. 2007).  "A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement."  A. Lord, Williston on Contracts § 4:21 (Certainty or definiteness of offers).

## RELEVANT LAW REGARDING TITLE VII

To allege a Title VII violation, the burden of proof is on the plaintiff, not the defendant, to establish, in the absence of direct evidence, a discriminatory motive.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973).  Under McDonnell Douglas Corp. v. Green, a plaintiff must set forth a prima facie case of discrimination.  See Kelly v. City of Albuquerque, 375 F.Supp.2d 1183, 1210 (D.N.M. 2004)(Browning, J.).  Upon the employer's articulation of a legitimate, nondiscriminatory reason . . . the presumption of discrimination established by the prima facie case 'simply drops out of the picture.'"  Id. at 1210 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)).

## ANALYSIS

Both parties rely on the Settlement Agreement's language, but contend that it shows different intent.  Grubb's primary argument is that she thought, before she signed the Settlement Agreement, that the language of the Settlement Agreement barred collection of the debt.  It is the Defendant's

position that the debt was created as a result of an overpayment of salary which occurred in 2000 and, therefore, was not settled as a part of the underlying lawsuit. The Court concludes that both interpretations are reasonable, that the Settlement Agreement is ambiguous, and that the factfinder must interpret the parties' intent and whether there was a meeting of the minds. Accordingly, the Court will deny the Defendant's motion for summary judgment.

## I.   FEDERAL COMMON LAW GOVERNS THE INTERPRETATION OF THE SETTLEMENT AGREEMENT.

There is no evidence that the parties intended for New Mexico law rather than federal common law to govern the November 2006 Settlement Agreement. The federal common law regarding interpretation of contracts thus applies. The parties have not, however, pointed to any federal common law that indicates the general principles of contract interpretation set forth in Mark V, Inc. v. Mellekas are inconsistent with, or different from, federal common law.

## II.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT ON MOST OF THE FACTUAL ISSUES.

Grubb did not present admissible evidence to dispute most of the Defendant's statement of facts, and therefore Grubb has failed to demonstrate a disputed material fact within the meaning of rule 56 for most of the factual history of this case. Grubb's recitation of disputed facts does not present any material facts upon which the Defendant's motion is based and which are properly disputed. Most of Grubb's attempts to create a disputed material fact are conclusory statements unsupported by any citation to the record. Thus, to the extent that Grubb attempts to dispute the Defendant's statement of facts and basic chronology without citations to the record, Grubb has failed to show that there is any dispute as to the material facts.

Specifically, in reply to Grubb's contentions that the debts for overpayment are unsubstantiated and that she was never provided evidence of the debts, the Defendant attached to

its Reply letters and bills sent to Grubb in early 2005 regarding the overpayment.  The Defendant further represents that Grubb was provided, during discovery, all of the documents upon which the Defendant relies to establish that she owes the debt.  The Defendant maintains that Grubb cannot assert that she does not possess the knowledge to refute the Defendant's statement of undisputed material facts.  In any case, even absent this evidence, Grubb's alleged ignorance is not a basis upon which to state that she does not owe the debt.  In sum, Grubb has offered no disputed material facts on the basic chronology.

The central issue, however, is what the words of the Settlement Agreement mean and what the parties meant by those words.  As a preliminary matter, the Court notes that the Defendant does not contend that the words are ambiguous, and Grubb expressly asserts that the language of the Settlement Agreement is clear and unambiguous.  These respective positions suggests that there is no question of fact with respect to the Settlement Agreement.

On the other hand, the record suggests that the Defendant did not think about the debt when it entered into the Settlement Agreement and thus did not think it was bargaining in any way about that issue.  In contrast, there is evidence in the record that Grubb had the debt in mind when she entered into the Settlement Agreement.  Thus, there is evidence in the record that Grubb intended it to resolve the debt issue and that the Defendant did not.

Accordingly, there is a factual dispute about the parties' intent.  If the language in the Settlement Agreement can reasonably be read to support each party's intent, then there is a factual dispute about the parties intent.  And the Court cannot resolve a factual issue on summary judgment.

## III.    THERE IS AMBIGUITY WHETHER THE SETTLEMENT AGREEMENT WAS A MUTUAL RELEASE.

On the record before the Court, the Court cannot say that the Settlement Agreement covered

only Grubb's Title VII claims or precisely what her Title VII claims included.  It appears that Grubb and her counsel intended the release to be mutual and release Grubb from the debt; the Defendant apparently did not even think about the debt when it entered into the Settlement Agreement.  In such a situation, there is a question of fact that the factfinder, not the Court on a motion for summary judgment, must resolve.

### A.   GRUBB'S INTERPRETATION OF THE LANGUAGE IN THE SETTLEMENT AGREEMENT IS A REASONABLE CONSTRUCTION.

Grubb maintains that the Settlement Agreement's plain language provides that the Defendant released any claim to reimbursement of alleged overpayment to Grubb and, thus, the Defendant has no claim to compensation for overpayment.  Grubb contends that the Settlement Agreement's plain language does not support the Defendant's position -- that the Defendant did not waive its right to recover alleged overpayments -- and that the inquiry should end with a denial of the Defendant's motion.  Grubb further contends the fact that the language is unambiguous falls in her favor, because the language provides that all claims by the Defendant against Grubb were settled.  Grubb argues that the unambiguity should result in the denial of the Defendant's motion.

In support of her position that the Settlement Agreement is unambiguous, Grubb asserts that the Settlement Agreement's language constitutes an unambiguous mutual release and that, therefore, the Defendant waived any right it had to recover the disputed funds.  Grubb relies primarily on the language contained in paragraph 1 of the Settlement Agreement.  There is certainly plain language in the Settlement Agreement that supports Grubb's position that the Defendant is precluded from recovering the repayment it seeks by stating that the "parties agree to settle compromise each and every claim of any kind whatsoever."

As to the rest of the Settlement Agreement, Grubb points out that the use of the word "and"

-23-

in the first sentence of the language shows that the "each and every claim of any kind whatsoever" language is meant to apply in addition to the more specific issues addressed throughout the rest of the agreement.  The use of the word "and" in the first paragraph is plain: any reasonable person would read the initial blanket settlement in conjunction with the rest of the Stipulation for Compromise Settlement's language.  The word "and" is defined as "1) Together with or along with; in addition to; as well as.  Used to connect words, phrases, or clauses that have the same grammatical function in a construction; 2) Added to; plus: Two and two makes four." The American Heritage Dictionary of the English Language 68 (3d ed. 1992)(emphasis in original).  Grubb reads paragraph 1 as:

> "The parties do hereby agree to settle and compromise each and every claim of any kind whatsoever, whether known or unknown AND all claims of Plaintiff which could have been brought as of the date of the execution of this Stipulation for Compromise Settlement and Release of Claims Under Title VII of the Civil Rights Act of 1964."

Response at 5 (quoting Settlement Agreement ¶ 1, at 1)(emphasis in original).  Grubb maintains that paragraph 1's plain language, and the use of word "and," show that the blanket settlement of all claims applies in addition to the specific issues resolved by the rest of the Settlement Agreement. Grubb contends that the Defendant's position arguably would render the first section of the Settlement Agreement meaningless or superfluous, which would lead a reasonable person to wonder why it was included if it did not mean what it said or added something.

Further,  even if the Court or factfinder ultimately determines that the subsequent language regarding Grubb's Title VII claim limits the applicability of the Settlement Agreement, there is some evidence that the issue of overpayment and retained pay were a part of her Title VII claim.  It is not clear, from the face of the Settlement Agreement, what is meant by the phrase "[c]laims under Title VII of the Civil Rights Act of 1964."  Settlement Agreement at 1.  Nevertheless, the Defendant's

position assumes that the debt issue is not part of the Title VII claims to which the remainder of the Settlement Agreement refers.

The Settlement Agreement's language referring to Grubb's Title VII claim arguably supports a waiver by the Defendant.  While that support is not apparent from the face of the document, there is evidence in the record that Grubb's Title VII claim was based in part on repayment issues as part of her claims of discriminatory treatment and damages resulting therefrom.  The record before the Court does not make it clear that the Defendant's position is correct.   The unmistakable language of the Settlement Agreement is not enough to justify the Defendant's motion.

Unfortunately for Grubb, the issue of overpayment is not a well-documented part of her Title VII claim.  There is certainly evidence that the repayment issue was part of the Title VII claims.  At the January 29, 2002, EEOC hearing evaluating that complaint, the administrative law judge held that Grubb's claims about retained pay, even if the Defendant had corrected some of those amounts, could be evidence of a hostile work environment, reprisal, and of her damages.  See Transcript of January 29, 2002, EEOC Hearing at 112:19-114:11.  From the content of Grubb's Fourth Amended Complaint, the transcript of the January 29, 2002, hearing, and Grubb's Affidavit in support of the Fourth Motion to Amend Complaint, in Grubb v. Babbitt, there is support for the fact that the repayment or original overpayment issue was included in Grubb's Title VII claim and, if the Settlement Agreement is a mutual release, covered by the Settlement Agreement.

What is less clear is whether the overpayment to Grubb was part of Grubb's Title VII claims.  The Defendant contends that the January 2002 hearing, the Amended Complaint, and Grubb's Affidavit are inapplicable to the overpayment/debt issue.  Grubb attempts to encompass the collection for overpayment in the settlement agreement by pointing to the Fourth Motion to Amend Complaint in her Title VII case from 2001.  Grubb maintains that she included her dispute about

alleged overpayment and collection attempts in her Fourth Motion to Amend Complaint in her EEOC action.  See Response at 2, 7.

When the Court carefully reviews Grubb's Fourth Motion to Amend Complaint, however, the Court does not see any express reference to the debt issue. That motion mentions, however, in connection with Grubb's claim of a hostile work environment: "Continued to inflict emotional, psychological, and monetary damages to the complainant by not resolving the Termination of Retained Pay issue errors made by the Personnel and/or Payroll offices." Motion to Amend ¶ 7, at 2.  Grubb specifically directs the Court's attention to page 7 of the affidavit submitted in support of Grubb's motion to amend, where Grubb avers that:

> The continuing actions by the Agency with regard to their Termination of Retained Pay fiasco that continues to this day . . . including all of the bills I have received to date . . . and the volume of correspondence it has taken to attempt to straighten this matter out . . . . Two weeks ago, I received a phone call from the Payroll Office that advised me that everything that the Personnel Office had done to reverse the Termination of Retained Pay was done in "error," and I would be receiving yet another bill, this time for approximately $12,000.  I immediately advised the Personnel Office, and they said that Payroll would be "auditing" my earnings, and that is where matters stand at this time.

Grubb Aff. ¶ 3(f), at 7.

The record does not explain why the Defendant overpaid Grubb.  Giving all possible reasonable inference in favor of the moving party, it is possible to infer that there was some tie between the repayment and the debt issue.  While the Court has no way from this record of deciding how the overpayment to Grubb occurred, it may have been an overcorrection to the repayment issue. If so, there is a connection between the two issues, and if Grubb never agreed that she had been treated fairly or accurately with the repayment issue, she may have felt that there was no overpayment.

The Defendant is no doubt correct that the January 1997 settlement upon which Grubb relies

does not apply directly to this case.   The Defendant contends that, because the overpayment at issue

allegedly occurred in 2000, it could not have been a part of a settlement in 1997.  On the other hand,

neither Grubb nor the Defendant has produced a copy of the 1997 settlement agreement.  Moreover,

if some overpayment issue were a part of the settlement in 1997, it would not have been an issue in

the EEOC proceedings, and the Fourth Motion to Amend Complaint indicates that overpayment was

an issue in the 2002 EEOC hearing.

While the Defendant maintains that the inadvertent overpayment that is at issue here had no

relationship to the retained pay issue other than being temporally related, the Court cannot tell from

the record.  The Defendant contends that the overpayment issue is not related, other than temporally,

to other retained pay issues to which Grubb referred in her Title VII claim and EEOC complaints,

but the Defendant does not provide support for that assertion. The Defendant does not explain to the

Court how the overpayment occurred, and thus attempts to eliminate any connection to the

repayment or underpayment issue that was occurring in the same time frame.

The Defendant maintains that the fact that the overpayment to Grubb took place within the

same time frame as the repayment issue cannot, alone, serve to obscure the fact that two separate

debts and different transactions are at issue.  But the Defendant does not prove or explain why they

are two separate debts or different transactions.  The record does not tell the Court whether they are

separate or related.

All the Court knows is that the debt that Grubb owes the BLM, and which she is disputing,

was created because Grubb was inadvertently paid more compensation than that to which she was

entitled.  The Court also knows that this overpayment occurred approximately at the same time that

she was correctly reimbursed for "retained pay," which had been erroneously terminated

prematurely.  The Court also knows that the retained pay was an issue for a brief time during the

administrative phase before the EEOC.  Grubb was entitled to the retained pay because her position had been downgraded.

Accordingly, Grubb's Title VII claim possibly encompassed the issue of overpayment and the Defendant's subsequent collection attempts.  Thus, there is evidence in the record that Grubb, in good faith, released her substantial discrimination claim against the Defendant in exchange for a monetary settlement and a release of the Defendant's claims against her, which avoided what promised to be a long and costly trial.  There is certainly plain language in the Settlement Agreement that supports Grubb's belief and position.

Grubb contends that, by reviving this action with the Defendant's motion, the Defendant seeks to avoid the promise it made in violation of the principles of contract law and the public policy favoring settlements.  That there is evidence to support Grubb's interpretation, however, does not mean that the language is necessarily unambiguous.  The Court also cannot go so far as to effectively grant Grubb summary judgment.  The Court cannot, as Grubb suggests, conclude as a matter of law that the Defendant's lawsuit is an attempt to breach the Settlement Agreement and violates a principle of the federal common law and of public policy favoring settlements.  In the end, the Court also concludes that the Defendant's construction is reasonable.

### B. THE DEFENDANT'S CONSTRUCTION OF THE LANGUAGE IN THE SETTLEMENT AGREEMENT IS REASONABLE.

The Settlement Agreement's language arguably undercuts the Defendant's assertions, but it does not completely refute them.  The Defendant believes, with reasonable justification, that the Settlement Agreement did not include the parties' dispute about the alleged overpayment of retained benefit.  The Defendant maintains that the Settlement Agreement required Grubb to forfeit all of her rights to pursue her discrimination claims, but did not apply to any subsequent claims that the United

States decided to pursue.

There is no dispute that the first part of the Settlement Agreement's language is general and broad.  Grubb maintains that, despite the Defendant's statements that the Settlement Agreement does not apply to the ongoing payment dispute between the parties, the Settlement Agreement's plain language provides that it resolved any and all disputes between the parties.  In support of its argument, Grubb repeatedly states that the plain language of the Settlement Agreement resolved all claims between the parties.

If the words "between the parties," appeared in the Settlement Agreement, it would be a stronger case that a reasonable person could agree that the Settlement Agreement resolved all claims stemming from Grubb's federal employment.  On the other hand, while Grubb maintains that the Settlement Agreement was of all claims "between the parties," that phrase does not appear in paragraph 1.  Specifically, the beginning language in paragraph 1 of the Settlement Agreement does not, as Grubb maintains, clearly state that the Settlement Agreement resolved claims of any kind between her and her former employee.  That language has to be implied to support Grubb's position, and while that is a reasonable addition or gloss, it is possible to read the language as a one-sided release, not a mutual one.  The blanket language at the beginning of paragraph 1 does not clearly show that the Defendant waived its claim to repayment.

The Defendant attempts to turn the Court's attention from the early language of the Settlement Agreement to the issue of the parties' intent by arguing that the rest of the Settlement Agreement shows that the parties did not intend to resolve payment issues.  The Defendant essentially argues that the rest of the Settlement Agreement's language modifies the "each and every claim of any kind whatsoever" language to apply only to Title VII claims.  Specifically, the Defendant maintains that the quotation in paragraph 1 -- "to settle and compromise each and every

claim of any kind whatsoever" -- is modified in the same paragraph to include:

> [A]ll claims of Plaintiff which could have been brought as of the date of the
> execution of this Stipulation for Compromise Settlement and Release of Claims
> Under Title VII of the Civil Rights Act of 1964 . . . arising directly or indirectly from
> the acts or omissions beginning in 1989 at the Farmington Field Office, Bureau of
> Land Management, Department of the Interior, that gave rise to an action filed in the
> United States District Court for the District of New Mexico in which Enid Grubb is
> the Plaintiff and Gale A. Norton, Secretary, U.S. Department of the Interior, is the
> Defendant . . . and the actions brought by Plaintiff before the Merit Systems
> Protection Board.

Settlement Agreement ¶ 1, at 1.  The Defendant maintains that this language reflects what the parties

intended: to settle the Title VII claims that Grubb brought in the United States District Court for the

District of New Mexico and before the MSPB.  The Defendant emphasizes that it is apparent from

the remainder of the Settlement Agreement that the parties intended that Grubb would release any

and all of the claims which she could have brought against Defendant "for damages allegedly

received because of discrimination on the basis of sex (female), hostile work environment, and

reprisal/retaliation for having engaged in protected activity and/or whistleblowing."  Settlement

Agreement ¶ 1, at 1.  The Defendant contends that, because the remainder of the provisions

contained in the Settlement Agreement pertain to the release of Grubb's Title VII claims, no other

language in the document could be construed as a release of any claims the United States might have

against Grubbs.  In sum, the Defendant maintains that, when the Settlement Agreement is construed

as a whole, it is apparent that there was no intent on the Defendant's part to release Grubb for any

outstanding debts owed.

There is language in the Settlement Agreement which supports the Defendant's reading that

the Settlement Agreement cannot be construed as a mutual release of all claims on the part of each

party.  There is evidence that the release was not mutual and did not cover the overpayment claim.

A reasonable fact finder could find that the controlling language of the release speaks only to

-30-

Grubb's claims that could have been brought pursuant to her Title VII complaint.

The Defendant also contends that the correspondence between Grubb and the Defendant regarding Grubb's request to change her official personnel file records demonstrates that the negotiations leading up to the settlement agreement were silent with regard to the overpayment debt. It appears that Grubb and her counsel did not raise the issue. On the other hand, this evidence does not undercut Grubb's position that she thought the Settlement Agreement was, as written, a mutual release.

Furthermore, there is evidence that the debt issue could not have been, and was not, part of Grubb's Title VII claims. The Defendant maintains that the repayment issue and the overpayment issue arose from entirely different transactions. In response to Grubb's contentions that the overpayment issue was part of her claim and arose as part of the issues surrounding her retained pay, the Defendant submits that the two claims are unrelated and that Grubb's response conflates the two issues of repayment and overpayment. The Defendant contends that the repayment claim was rendered moot by the repayment and is not at issue in this litigation. The Defendant argues that Grubb's repeated references to the claim and exhibits regarding the claim are therefore irrelevant to this matter.

Moreover, it seems unlikely an overpayment, alone, could have formed a basis for Grubb's Title VII complaint. Nor is it likely that she could have brought such a complaint. As the district court stated in Kaulia v. County of Maui, Department of Public Works and Waste Management, 504 F.Supp.2d 969 (D. Haw. 2007): "Requiring the Plaintiff to repay the County for wages incorrectly disbursed to Plaintiff -- and which he did not rightfully earn or deserve as he himself admits -- does not constitute discrimination." Id. at 990. There is no evidence that Grubb was subjected to an adverse personnel action or treated differently than similarly situated individuals when she was

-31-

inadvertently overpaid.  The overpayment therefore was not something which likely could have been brought as a claim under Title VII.  Consequently, the Defendant maintains that the Settlement Agreement was not intended to and did not waive her responsibility to pay the debt.

The Defendant also argues that Grubb has proffered no evidence that the administrative mistake resulting in an overpayment stemmed from discriminatory motives.  The Defendant states that Grubb's referencing of arguments she made in the context of the repayment issue is not the same as her establishing evidence of discrimination in the overpayment context.  The Defendant contends that Grubb has not shown that the overpayment claim could have been brought as part of her Title VII case and, thus, has not established that the Settlement Agreement covers the debt.  While the Court cannot say what the evidence will ultimately be, and whether the repayment and overpayment issues have any relationship, the possibility that the two are related leaves this fact issue as one for the trier of fact, but also suggests that the Defendant's construction and proffered evidence is not unreasonable.

Grubb contends that the Defendant asks the Court to reach an unreasonable interpretation of the plain language of the Settlement Agreement. The Court cannot say, however, on the record before it, that the Defendant's assertions are misplaced.  The Court cannot say that the Defendant's contention that the rest of the Settlement Agreement modifies the initial language is unfounded.

The Defendants maintain that the facts of this situation are similar to those in <u>Melton v. Department of Health and Human Services</u>.  There, the Federal Circuit held that a settlement agreement did not prevent the federal agency from recovering its erroneous overpayment, where "the settlement agreement [wa]s silent about Ms. Melton's AWOL debt." 212 Fed.Appx. at 990. The plaintiff, like Grubb, sought "enforcement of the settlement agreement, based on an alleged violation by the Agency.  The alleged violation is the Government's effort to recover an erroneous

overpayment of $8,056.76. The erroneous overpayment stems from a period, prior to her removal, when [the plaintiff] was paid while absent without leave (AWOL)." Id. at 989.  The Federal Circuit did not find any ambiguity because

> the settlement agreement is silent about Ms. Melton's AWOL debt. The most relevant sections are paragraphs 1 and 9, and these paragraphs specify a lump sum payment to Ms. Melton in exchange for her removal from the Agency. Paragraph 14 adds that "[n]o other promises or agreements shall be binding unless signed by all parties and expressly designated as an amendment to this agreement." Nothing in the settlement agreement addresses whether the Agency may or may not collect debts duly owed.

Id.   In Melton v. Department of Health and Human Services, the agreement was unambiguous, unlike the Settlement Agreement.  Moreover, unlike the agreement in Melton v. Department of Health and Human Services, the Settlement Agreement does not contain a clause regarding amendments to the Settlement Agreement.  Thus, although the disagreement in  Melton v. Department of Health and Human Services also involved an overpayment issue, it is distinguishable from the disagreement between Grubb and the Defendant, because the Settlement Agreement is ambiguous.  While the Court does not believe that Melton v. Department of Health and Human Services is controlling, it demonstrates that the Defendant's construction is reasonable.

## C.   BOTH PARTIES' INTERPRETATIONS WOULD PRODUCE REASONABLE RESULTS.

The Court must also be careful to construe the Settlement Agreement in a matter that does not cause an absurd result.  A complete release by the United States of all claims against Grubb could be construed to mean that she is no longer required to pay income taxes owed to the United States government each year.  Such a result would be an absurd result.  But there is no contention that the United States has a claim for past taxes or for anything other than this one debt for overpayment.  Thus, that absurd result is not a possibility in this case.  Moreover, neither party's

-33-

interpretation of the Settlement Agreement is absurd.  A reasonable factfinder could find that either of the competing interpretations are reasonable, and either result in this case -- a bar to the Department's claim or allowing the claim for the debt -- would not be absurd.

**D.      THE AMBIGUOUSNESS OF THE SETTLEMENT AGREEMENT CREATES AN ISSUE OF FACT ABOUT THE PARTIES' INTENT.**

The Court has determined that the Settlement Agreement's plain language is not controlling. Accordingly, the issue of the parties' intent becomes a question of fact, which is disputed based on Grubb's and her counsel's affidavit.  Given such a dispute of material fact, summary judgment is not appropriate.

The Supreme Court of New Mexico's opinion in Mark V, Inc. v. Mellekas explains why summary judgment is not an appropriate resolution of this matter.  See 114 N.M. at 781, 845 P.2d at 1235 ("If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. . . . Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact.")(internal citations and quotation marks omitted). The New Mexico case is instructive given that, as the Tenth Circuit noted in Heuser v. Kephart, the federal common law governing contract interpretation does not differ from the New Mexico law governing contract interpretation.  The Court has determined that the Settlement Agreement's language is ambiguous.  Accordingly, the factfinder must determine the parties' intent.

The Defendant does address, however, the second part of the analysis required once ambiguity is found.  The Defendant's analysis skips the factual issue of Grubb and her attorney's intent, and goes immediately from saying that Grubb's interpretation of the Settlement Agreement is wrong to asking for summary judgment, thus missing an important step in interpreting the Settlement Agreement.

Both sides' arguments and constructions of the Settlement Agreement are somewhat conclusory.  Grubb argues that she is shielded from collection of the debt by the Settlement Agreement.  The Defendant contends that the Settlement Agreement was intended to cover only claims under Title VII.  As noted in <u>Klamath Water Users Protective Association v. Patterson</u>, just because the Defendant does not want the Settlement Agreement to apply to the payment issue does not mean that the language is ambiguous.  <u>See</u> 204 F.3d at 1210 ("The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation.").

Here, however, both competing interpretations are reasonable.  A dispute as to the parties' intent with respect to the Settlement Agreement is thus a question of fact.  Ambiguity as to the parties' intent to a contract, which the contract's plain language alone does not resolve, is a question of fact.  Grubb has provided sufficient evidence as to her intent -- that the Settlement Agreement included resolution of the repayment claims from both parties -- to contravene the Defendant's position.  There are thus disputes of fact in this matter, making the rule 56© remedy of summary judgment inapplicable.

The Court has determined that the Settlement Agreement is ambiguous.  Such a conclusion leaves questions of fact as to the parties' intent in entering into the contract, with Grubb maintaining that she believed that the Settlement Agreement resolved all claims, including those by the Defendant for repayment of alleged overpayments, and the Defendant maintaining that the Settlement Agreement did not encompass payment issues.  Such a question of fact is an issue for investigation by the factfinder, which renders summary judgment an inappropriate remedy in this matter.

**E.   THE ISSUE TO BE DECIDED AT TRIAL IS WHETHER THERE WAS A MEETING OF THE MINDS.**

While the Defendant suggests that there may have been a mutual mistake of fact, <u>see</u> Reply at 7-8,  the Court does not believe that the parties made a mutual mistake of fact.  The Defendant contends the Settlement Agreement does not include the debt, while Grubb maintains that it did include the debt.  Thus, the parties do not share a common mistake; they both contend a mistake, if any, supports their contrary conclusions.

Although there are issues of fact regarding the parties' intent, it is uncertain whether there is, or will be, a <u>genuine</u> issue of material fact, at any trial.  Grubb and Ms. Best contend, under oath, that they intended the Settlement Agreement to include the alleged debt that Grubb owed for overpayment, but the Defendant has not averred what the United States intended by entering into the Settlement Agreement.  It may be, however, when the evidence is in the record, that there is no dispute that Grubb and the United States had different intentions in entering into this Settlement Agreement.  If that is the case, then the issue becomes whether inclusion or exclusion of the overpayment debt was a material term.  If it was a material term, and the parties did not come to an agreement on it, then there may be no contract between the parties, because there was no meeting of the minds.

The Defendant conceded at the August 15, 2008 hearing that there is an issue whether the parties had a meeting of the minds.  <u>See</u> Tr. at 11:24-6 (Court & Dow).  If the parties do not enter into "an agreement regarding the essential and material aspects of the [contract] and [if] there [is] not . . . a meeting of the minds, there is no enforceable contract between [the parties]."  <u>Balboa Const. Co., Inc. v. Golden</u>, 97 N.M. at 302, 639 P.2d at 589.  This litigation threatens to undo the Settlement Agreement that the parties wanted to resolve the Title VII case in 2005.

All that is before the Court to decide on this motion is whether summary judgment in favor of the Defendant is appropriate.  The Court believes that there are genuine issues of material fact and that summary judgment is inappropriate as a matter of law.  The Court is, however, attempting to envision what a trial on the merits of this case would involve, give some guidance to the parties as to what the Court is thinking, and assist them in preparing for trial.

The open question is what does determining what the parties' intent mean in a practical sense in the context of this case.  In other words, what will the trial look like?  The Court believes the trial will involve a determination of the parties' intent in entering into the Settlement Agreement, which will include a determination whether there was a meeting of the minds.

A contract requires a meeting of the minds of the parties on all material terms.  Material terms include areas such as subject matter, price, payment terms, quantity, quality, and duration, such "that the promises and performance to be rendered by each party are reasonably certain." Tauber v. Quan, 938 A.2d at  730.  The Court cannot, on the record before it, determine whether release or reservation of the overpayment debt would have been a material term.  At the end of the day, if the inclusion of the overpayment debt was a material term,[2] then there may be no agreement between the parties.  Both parties have indicated, however,  that they do not wish for the Settlement Agreement to be void.  See Tr. at 12:15-18 (Dow); id. at 18:6-7 (Best); id. at 18:14-15 (Best).  If the term was not material, there was not meeting of the minds on the debt issue, and Grubb cannot use the Settlement Agreement as a shield from collections.

The Defendant also contends that Grubb should have brought the overpayment claim openly to the bargaining table during settlement negotiations.  The Defendant asserts that, instead of

---

[2] Materiality of contract terms and the determination of whether a contract existed are questions of fact.  See Stites v. Yelverton, 60 N.M. 190, 193, 289 P.2d 628, 630 (1955).

bringing the issue openly to the bargaining table, it appears that Grubb kept silent as to the issue of overpayment and hoped that the release's general language would cover the issue. The Defendant contends that it would be inequitable to hold the United States to a release of all debts against Grubb under the Settlement Agreement when the only persons involved in the negotiations who had knowledge of the overpayment claim were Grubb and her attorney.

At the hearing, the Defendant suggested that Grubb may be estopped from claiming that the debt was included in the Settlement Agreement. <u>See</u> Tr. at 20:14-16 (Dow). The parties' briefing and argument did not focus on the estoppel issue, and the Court need not decide it. The Defendant did not fully brief the estoppel issue, and the Court is concerned that the estoppel defense is another issue that may have to be decided by the factfinder, not the Court, under New Mexico law. <u>Compare Sheldon v. Hartford Ins. Co.</u>, 2008-NMCA-098, ¶ 20, 2008 WL 3010116 at *7 ("[U]nder New Mexico law, an estoppel requires some showing of detrimental reliance or prejudice."); Answer, filed July 23, 2007 (Doc. 9)(asserting defenses of estoppel, laches, and waiver as fifth affirmative defense) <u>with Jones v. Denver Public Schools</u>, 427 F.3d 1315, 1326 (10th Cir. 2005)("This final element of promissory estoppel involves a discretionary decision for the court, and is not a question of fact for the jury."). In any case, the Court is reluctant to decide this issue on summary judgment without competent evidence from the United States of what its attorneys thought or knew, and more about the relationship between the repayment and overpayment issues. The Court probably needs to hear testimony on these issues before it can make a ruling in equity.

In conclusion, the Defendant has not offered authority that effectively supports the request in its motion for summary judgment. The Court will thus deny the Defendant's request for an order granting summary judgment on its behalf. This matter must proceed to trial and cannot be resolved by summary judgment.

**IT IS ORDERED** that the Defendant's Motion for Summary Judgment is denied.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Hannah B. Best
Hannah Best & Associates
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

Gregory J. Fouratt
 United States Attorney
Phyllis A. Dow
 Assistant United States Attorney
Albuquerque, New Mexico

 *Attorneys for the Defendant*